## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br>1212 Broadway, Suite 800<br>Oakland, CA 94612<br><br>FRIENDS OF THE EARTH<br>1717 Massachusetts Avenue, N.W., Suite 600<br>Washington, DC 20036<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY and GINA MCCARTHY,<br>Administrator,  United States Environmental<br>Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br><br>　　　　　Defendants. | Civ. No. 1:16-cv-00681<br><br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Plaintiffs, the Center for Biological Diversity and Friends of the Earth
(collectively, "Plaintiffs"), bring this action against Defendants, the United States Environmental
Protection Agency and Gina McCarthy, Administrator of the U.S. Environmental Protection
Agency (collectively, "EPA"), for unreasonable delay under section 304 of the Clean Air Act
("CAA" or "the Act"), 42 U.S.C. § 7604(a).  Plaintiffs seek declaratory and injunctive relief for
the Defendants' unreasonable delay in complying with section 231 of the Act, 42 U.S.C. § 7571.
Specifically, EPA has delayed unreasonably in (1) issuing an "Endangerment Finding" for
aircraft determining that carbon dioxide (CO2) emitted by aircraft engines causes or significantly
contributes to air pollution which may reasonably be anticipated to endanger public health or
welfare; and (2) promulgating regulations limiting such emissions.

2.      Plaintiffs petitioned EPA to issue the endangerment finding and promulgate standards in 2007. EPA's delay in this matter so far exceeds eight years.

3.      In July 2011, the U.S. District Court for the District of Columbia held that EPA has a compulsory duty to issue an endangerment finding determining whether emissions of greenhouse gases from aircraft engines cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. *Center for Biological Diversity v. EPA*, 794 F. Supp. 2d 151, 162 (D.D.C. 2011).

4.      Four years after the D.C. District Court's ruling, EPA issued a Proposed Finding that Greenhouse Gas Emissions from Aircraft Cause or Contribute to Air Pollution that May Reasonably Be Anticipated to Endanger Public Health and Welfare and Advance Notice of Proposed Rulemaking, 80 Fed. Reg. 37,758 (July 1, 2015) ("Proposed Endangerment Finding and ANPR"). EPA has yet to issue a final endangerment finding or promulgate regulations regarding aircraft emissions.

5.      Christopher Grundler, the Director of the Office of Transportation and Air Quality at EPA, indicated in a press call on June 10, 2015 that EPA anticipates that an endangerment finding will not be finalized until the spring of 2016, at the earliest. EPA identified sometime in 2017 as the earliest date for publication of proposed regulations following that endangerment finding, and 2018 as the earliest possible date for the promulgation of a final rule regulating aircraft emissions. Even if EPA were to follow through on this proposed timeline, an endangerment finding and final rule would be adopted at least five and seven years, respectively, after the D.C. District Court's ruling, and at least nine and eleven years, respectively, after Plaintiffs' petitioned EPA for action. This constitutes unreasonable delay in EPA's duty to issue an endangerment finding and promulgate regulations regarding greenhouse gas emissions from aircraft.

**JURISDICTION**

6.      This action is brought under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (action arising under the laws of the United States) and section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a) (citizen suit provision).

8.      Section 304(a) of the Act requires that written notice of intent to bring suit for unreasonable delay under the Act must be provided to the Administrator of EPA 180 days prior to commencement of such an action.  42 U.S.C. § 7604(a).  On August 5, 2014, Plaintiffs notified the Administrator by certified mail of Plaintiffs' intent to file suit for unreasonable delay in issuing a final endangerment finding and promulgating rules regarding aircraft emissions.  The 180-day notice period expired on January 31, 2015.

**VENUE**

9.      Venue lies in this judicial district pursuant to section 304(a) of the Clean Air Act, which provides that "an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title."  42 U.S.C. § 7604(a). Section 307(b)(1), (section7607(b)(1) in the United States Code), provides that "[a] petition for review of…any standard under section 7571 of this title, …or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1). Aircraft standards are set pursuant to section 231 of the CAA. 42 U.S.C. § 7571. Therefore, this action for review of those standards and unreasonable delay in promulgating aircraft emissions regulations must be filed in the United States Court of Appeals for the District of Columbia.  *Id*. § 7604(a).

10.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendant EPA has its principal office here; Plaintiff Friends of the Earth is headquartered here; and a substantial part of the events or omissions giving rise to the claim occurred in the district.

## PARTIES

11.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY:

a.     The Center for Biological Diversity (the "Center") is a non-profit corporation with offices in California and throughout the United States.  The Center works to protect wild places and their inhabitants.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. Combining conservation biology with litigation, policy advocacy, and strategic vision, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the wilderness they need to survive, and by extension, for the spiritual welfare of generations to come.  The Center works on behalf of it members, who rely upon the organization to advocate for their interests in front of state, local and federal entities, including EPA and the courts.  The Center currently has approximately 47,000 members.

b.     One of the Center's practice areas and programs is the Climate Law Institute, an internal institution with the primary mission of curbing global warming and other air pollution, and sharply limiting its damaging effects on endangered species, their habitats, and human health for all of us who depend on clean air, a safe climate, and a healthy web of life.  Global warming represents the most significant and pervasive threat to biodiversity worldwide, affecting both terrestrial and marine species from the tropics to the poles.  Absent major reductions in greenhouse gas emissions, by the middle of this century upwards of 35

percent of the earth's species could be extinct or committed to extinction as a result of global warming.

    c.  The overarching goal of the Climate Law Institute is to limit global warming pollution and reduce greenhouse gas emissions in order to protect biological diversity, the environment, and public health.  The Center has successfully petitioned for the first listings of global-warming threatened species under the Endangered Species Act, including the polar bear and the staghorn and elkhorn corals in the Caribbean.  Specific objectives of the Climate Law Institute also include ensuring compliance with applicable law in order to reduce greenhouse gas emissions and other air pollution, and educating and mobilizing the public on global warming and air quality issues.  The Center has advocated in numerous local, state, and federal fora for the availability of improved climate-related information, for informed decision-making on matters related to climate, and for the reduction of global warming pollutants.  In 2007, the Center successfully petitioned the EPA to regulate greenhouse gases under section 202 of the Clean Air Act as a party in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which overturned EPA's decision not to regulate greenhouse gases from automobiles.  The Supreme Court's decision ultimately led to EPA's first-ever rulemaking to reduce greenhouse gas emissions from passenger cars and light trucks under section 202.  That rulemaking is comprised of the *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ("Endangerment Finding"), and the *Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*, 75 Fed. Reg. 25,324, 25,397 (May 7, 2010), and its successor rulemakings updating light duty vehicle greenhouse gas standards and setting standards for heavy duty vehicles.  The Center has been an active participant in each of those rulemakings.

d.      The Center has been involved in numerous other Clean Air Act administrative proceedings and legal actions seeking to enforce the Act's provisions for greenhouse gases.  For example, the Center was a participant in the litigation challenging EPA's rulemakings that enforce the Clean Air Act's PSD permitting program and best available control technology ("BACT") requirements for greenhouse gases emitted by stationary sources culminated in *Util. Air Reg. Group v. EPA*, 573 U.S. __, 134 S. Ct. 2427, 2449 (2014).  It was also a commenter on and engaged in litigation concerning New Source Performance Standards for various industrial facilities.  The Center is currently a respondent-intervenor in the litigation challenging EPA's regulations to reduce greenhouse gases from power plants, *West Virginia v. EPA,* No. 15-1363 (D.C. Cir. 2015).

e.      The Center and its members are harmed in a variety of ways by Defendants' delay in regulating greenhouse gas emissions from aircraft.  First, the Center and its members are harmed by global warming and climate disruption caused by greenhouse gas pollution.  Many Center members have professional, scientific, educational, moral, spiritual, aesthetic, and other interests in the continuing existence of species and their habitats that are threatened by global warming.  These members include, among others, teachers, wildlife photographers, biologists, and other scientists whose professional activities will be directly affected by the depletion of species and the degradation of their environment by global warming. For example, some Center members have traveled extensively to observe polar bears and other species threatened by global warming and to study their habitat, and they have present plans to continue such pursuits.  Continued unabated, greenhouse gas emissions will result in extinction or reduction of the polar bear and many other species, limiting the Center's members' ability to enjoy, learn from, benefit from, and earn a livelihood from studying, photographing, and reporting about them.

f.      Second, the Center and its members are harmed by the secondary effects of global warming caused by greenhouse gas emissions.  For example, global warming intensifies other forms of air pollution, such as smog, which has severe impacts on human health, species, and ecosystems.  The Center's members are harmed by the effects of these other forms of air pollution, particularly when they damage members' health and natural environments.  The Center's members are further harmed because global warming's secondary effects include increased frequency of drought and wildfires, and rising sea levels, all of which damage ecosystems and limit species diversity.

g.      The Center members are vitally concerned with and harmed by the deleterious effects of greenhouse gases.  They are both personally and professionally injured by Defendants' failure to act in response to the petitions to regulate greenhouse emissions from aircraft.  Defendants have failed in their duty to issue regulations to control these pollutants, and thereby lessen or eliminate the harm to Plaintiffs.  The United States is the world's second largest emitter of greenhouse pollution, and the U.S. is responsible for an estimated 16 percent of global greenhouse gas emissions.  The transportation sector accounts for roughly one third of all U.S. greenhouse gas emissions.  The aircraft industry represents a significant part of transportation sector emissions, and control of these emissions is an essential part of solving the climate crisis.  Aircraft emissions are projected to triple by 2050.  By failing to finalize an endangerment finding and promulgate regulations, Defendants are circumventing an essential part of the solution to global warming and directly harming the Center's interests in stemming air pollution.  A favorable decision in this case, requiring Defendants to adopt an endangerment finding and aircraft emissions standards, will directly redress the harms to the Center and its members discussed herein.

h.      The Center and its members also suffer procedural and informational

injuries related to Defendants' failure to initiate appropriate rulemaking procedures in response

to the proposed positive endangerment finding.  This failure violates the procedural rights of the

Center and its members to participate beneficially in the rulemaking process.  If and when

Defendants finalize the endangerment finding and initiate the regulatory process for aircraft

emissions, the Center and its members will participate in this process, will contribute to and gain

information from it, and will advocate in favor of reducing air pollution from aircraft.

Defendants' unreasonable delay in finalizing an endangerment finding and promulgating

regulations frustrates and harms the Center's ability to participate in and advise that process.

12.     Plaintiff  FRIENDS OF THE EARTH:

a.      Friends of the Earth, Inc. ("FoE") is a tax-exempt environmental advocacy

organization founded in 1969 and incorporated in the District of Columbia, with offices in

Washington, D.C. and Berkeley, California.  FoE's mission is to defend the environment and

champion a healthy and just world by focusing on the economic drivers that encourage

environmental degradation.  FoE is a member of Friends of the Earth International, a global

network of more than two million activists in 75 countries.

b.      Addressing climate change and reducing greenhouse case emissions is one

of FoE's core projects.  FoE's Climate and Energy program seeks to reduce reliance on fossil

fuels and other energy sources that pollute the air and threaten human health.  Working with the

Friends of the Earth International federation, FoE engages in international climate change

negotiations and advocacy efforts to support the adoption of policies to reduce emissions

worldwide.

c.      Friends of the Earth uses many tools to accomplish its greenhouse gas

reduction goals.  One approach taken by FoE is to end government financing, tax and subsidy

policies that provide incentives for fossil fuel use.  To this end, FoE has supported legislation in the U.S. Congress that would eliminate subsidies for the oil industry. FoE also works in a variety of ways to promote the widespread adoption of clean, efficient, low-greenhouse gas technologies.  One example is FoE's successful petition to EPA to make fuel economy labels on new vehicles substantially more accurate, thereby promoting the sale of more fuel-efficient vehicles.  FoE also initiated a campaign called *Scorched Earth*, which included filing legal petitions to force the National Park Service, the U.S. Forest Service, the U.S. Fish and Wildlife Service, and the National Oceanic and Atmospheric Administration to initiate planning and mitigation measures to address global warming impacts on America's national parks, forests, wildlife refuges, and marine sanctuaries.  Other actions taken by FoE to reduce the risk of climate change are:  promoting the development, testing, and installation of less polluting energy sources and pressing businesses to use less energy and build more efficient products.

> d.      FoE and its members are harmed in a variety of ways by Defendants' delay in regulating greenhouse gas emissions from aircraft.  First, FoE's members have professional, scientific, educational, spiritual, aesthetic, and other interests in a stable climate. Members of FoE use, enjoy, and live in areas that are, or will be, negatively affected by climate change.  For example, many FoE members own property near coastal areas threatened by sea level rise due to climate change.  Their use and enjoyment of, and in some cases their economic benefit from, these areas is diminished by the impacts of climate change.  The professional interests of members of FoE are also harmed by climate disruption.  FoE members include people who grow and harvest food products which are directly impacted by a changing climate. FoE members experience diminished opportunities for accomplishing their professions, including reduced opportunities for undertaking important biological research.  FoE members

have professional, scientific, educational, recreational, spiritual, aesthetic, and other interests in the continuing existence of species and their habitats that are threatened by global warming.

      e.      Second, FoE and its members are harmed by the secondary effects of global warming caused by greenhouse gas emissions.  For example, global warming intensifies other forms of air pollution, such as smog, which has severe impacts on human health, species, and ecosystems.  FoE members and their families also live in areas that are negatively impacted by the intensified air pollution and smog associated with global warming.  Greenhouse gas emissions also lead to degradation of ocean habitats and harm to marine species due to warming and acidification.  FoE members have professional, recreational, scientific, spiritual, aesthetic and other interests in researching, observing and experiencing healthy oceans and marine habitats.  In sum, FoE's members are personally and negatively affected by the continued release of pollutants that cause global warming and climate change.

      f.      FoE and its members are vitally concerned with and harmed by the deleterious effects of greenhouse gases.  They are both personally and professionally injured by Defendants' failure to act in response to the petitions to regulate greenhouse emissions from aircraft.  Defendants have failed in their duty to issue regulations to control these pollutants, and thereby lessen or eliminate the harm to Plaintiffs.  The United States is the world's second largest emitter of greenhouse pollution, and the U.S. is responsible for an estimated 16 percent of global greenhouse gas emissions.  The transportation sector accounts for roughly one third of all U.S. greenhouse gas emissions.  The aircraft industry represents a significant part of transportation sector emissions, and control of these emissions is an essential part of solving the climate crisis.  Aircraft emissions are projected to triple by 2050.  By failing to finalize an endangerment finding and promulgate regulations, Defendants are circumventing an essential part of the solution to global warming and directly harming FoE's interests in stemming air

pollution.  A favorable decision in this case, requiring Defendants to adopt an endangerment finding and aircraft emissions standards, will directly redress the harms to FoE and its members discussed herein.

    g.  FoE and its members also suffer procedural and informational injuries related to Defendants' unreasonable delay in undertaking rulemaking procedures in response to an endangerment finding.  FoE and its members are actively involved in a variety of regulatory processes to reduce greenhouse gas emissions and prevent climate change.  Defendants' delay in initiating a rulemaking procedure to regulate emissions from aircraft engines violates the procedural rights of FoE and its members to participate beneficially in that rulemaking process through comments, information sharing, and advocacy.  If and when Defendants begin a regulatory process, FoE and its members will participate in this process, will contribute to and gain information from the proceedings, and will advocate in favor of controlling greenhouse gas emissions from aircraft.

   13.  Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is a federal agency charged by the Clean Air Act with protecting and enhancing the quality of the Nation's air resources in order to promote the public health and welfare and the productive capacity of its population.  *See* 42 U.S.C. § 7401(b).  EPA is required by section 231 of the Act, 42 U.S.C. § 7571(a), to issue emissions standards applicable to pollutants from aircraft engines.

   14.  Defendant GINA MCCARTHY is the Administrator of the U.S. Environmental Protection Agency, and is sued in her official capacity.  Ms. McCarthy is ultimately responsible for ensuring that EPA complies with and fully implements the CAA in accordance with Congress's intentions.

## FACTUAL BACKGROUND

15.     EPA acknowledges that "[w]arming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level." 74 Fed. Reg. 66,517 (Dec. 15, 2009) (Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act) (2009 Endangerment Finding).

16.     In its 2009 Endangerment Finding, EPA found that "the scientific evidence is compelling that elevated concentrations of heat-trapping greenhouse gases are the root cause of recently observed climate change," *id.* at 66,518, and that "these high atmospheric concentrations of greenhouse gases are the unambiguous result of human activities," *id.* at 66,517.

17.     EPA recognized that "the climate change associated with elevated atmospheric concentrations of carbon dioxide and other well-mixed greenhouse gases have the potential to affect essentially every aspect of human health, society and the natural environment." *Id.* at 66,523.

18.     Specifically, climate change will "increase the risk of morbidity and mortality" due to direct temperature increases, air quality degradation, the potential for changes in vector-borne diseases, and the potential for changes in the severity and frequency of extreme weather events. *Id.* at 66,524.

19.     Additionally, global warming pollution and resultant climate change is likely to threaten water resources and coastal areas and impact climate-sensitive sectors, including agriculture, forestry, energy, and infrastructure. *Id.* at 66,531.

20.     The most significant human-generated causes of climate change are the emissions of six greenhouse gases: carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. *Id.* Of these six gases, both carbon dioxide and nitrous oxide are emitted by aircraft engines.

21.     The Supreme Court recognized that there is a consensus in the scientific

community that the increasing atmospheric concentration of carbon dioxide is a leading cause of

global climate change.  *Massachusetts v. EPA*, 549 U.S. at 504.

22.     Carbon dioxide is a "radiative forcing" gas that alters the balance of incoming and

outgoing energy in the Earth's atmosphere.  Carbon dioxide allows sunlight to pass through it

and warm the earth, but traps heat radiation leaving the Earth.  As levels of atmospheric carbon

dioxide increase, primarily from the burning of fossil fuels, less and less heat escapes the

atmosphere to space, and the planet warms.

23.     EPA's 2015 Proposed Endangerment Finding and ANPR regarding greenhouse

gas emissions from aircraft confirms and expands upon the 2009 Endangerment Finding on

climate change. In it, EPA "carefully reviewed the recent scientific conclusions in the

assessments regarding human-induced climate change impacts on public welfare." 80 Fed. Reg.

at 37,779. EPA found that "they are largely consistent with or strengthen the underlying science

supporting the 2009 Endangerment Finding regarding public welfare effects on food production

and agriculture; forestry; water resources; sea level rise and coastal areas; energy, infrastructure,

and settlements; ecosystems and wildlife; and impacts on the U.S. population from climate

change effects occurring outside the United States." *Id.*

I.     <u>**Global Warming Emissions from Aircraft Engines**</u>

24.     The transportation sector is the second largest greenhouse gas emitting industry

within the U.S. economy.  In 2013, aircraft emissions were the third largest transportation source

of greenhouse gases within the U.S. Aircraft account for approximately 11 percent of U.S.

mobile source carbon dioxide emissions and three percent of the country's total domestic

greenhouse gas emissions.  U.S. aircraft emissions also represent 29 percent of all aircraft

pollution worldwide, making the U.S. by far the largest source of aircraft-generated greenhouse

pollution in the world.  Aircraft engines also emit significant quantities of nitrogen oxides and water vapor. Within the domestic transportation industry, aircraft emissions are the single largest source of greenhouse gases not subject to EPA regulation.

25.     Aircraft have a disproportionate effect on global warming compared to other sources due to the amplified effect of high-altitude emissions.  For example, emissions of nitrogen oxides in the upper troposphere, where most aviation emissions occur, result in greater concentrations of ozone than ground-level emissions.  In addition, aircraft engines emit water vapor, a greenhouse gas that forms condensation trails, or "contrails," when released at high altitude.  Contrails themselves have a positive climate forcing effect.  They are also associated with increased formation of cirrus clouds which tend to warm the surface of the Earth, further contributing to global warming.  A recent report by the UK Royal Commission on Environmental Pollution stated that the net effect of aviation-induced ozone, contrail, and cirrus formation is expected to be three times the radiative forcing due to the $CO_2$ emitted from aircraft.

26.     Greenhouse gas emissions from aircraft are also anticipated to increase substantially in the coming decades because of a projected growth in air transport both in the United States and worldwide.  According to the Federal Aviation Administration, greenhouse gas emissions from domestic aircraft are expected to increase 60 percent by 2025, and the Intergovernmental Panel on Climate Change projects that emissions of carbon dioxide from aircraft engines will more than triple by mid-century.  EPA reports that while U.S. greenhouse gas emissions increased by 7.7 percent from 1990 to 2014, emissions by the transportation industry grew at a significantly higher rate – by 14 percent.

**LEGAL BACKGROUND**

I.     <u>**Statutory Context**</u>

27.     The Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, provides the Administrator of the U.S. Environmental Protection Agency with the exclusive authority to regulate the emission of pollutants from aircraft engines.

28.     Section 302(g) of the Clean Air Act broadly defines the term "air pollutant" to include:

> [A]ny air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air.  Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term 'air pollutant' is used.

*Id.* at § 7602(g).

29.     Section 231(a) of the Act, 42 U.S.C. § 7571(a), establishes a regulatory framework for the establishment of standards to reduce air pollutants from aircraft.

30.     This section directs the Administrator to study and investigate emissions of air pollutants from aircraft to determine the extent to aircraft emissions affect air quality in the United States and the technological feasibility of controlling those emissions. 42  U.S.C. § 7571(a)(1).

31.     Under section 231(a)(2)(A), the Administrator "shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7571(a)(2)(A).

32.     Accordingly, if the Administrator determines that aircraft emissions of carbon monoxide, nitrogen oxides, and volatile organic compounds contribute to air pollution, she must issue proposed standards to regulate these pollutants.  *Id.* § 7571(a)(2).  *See Massachusetts v. EPA*, 549 U.S. at 533.

33.     The Act further requires EPA to promulgate final regulations within 90 days of the issuance of its proposed emissions standards.  42 U.S.C. § 7571(a)(3).

**II.     <u>Regulatory History</u>**

34.     The Supreme Court firmly established that greenhouse gases – including carbon dioxide – constitute air pollutants within the meaning of section 302(g) of the CAA. *Massachusetts v. EPA*, 549 U.S. at 532.

35.     On December 5, 2007, Plaintiffs submitted a petition for rulemaking under section 231 of the CAA to control and reduce the emissions of air pollutants from aircraft that contribute to global climate change.  The petition requested that EPA provide a substantive response within 180 calendar days.  Those 180 days expired on June 2, 2008.

36.     In 2010, when EPA failed to respond to the petition, Plaintiffs filed suit for unreasonable delay.  EPA agreed to respond to the petition, but maintained that section 231 imposed no legal obligation to issue an endangerment finding. *Center for Biological Diversity v. EPA*, 794 F. Supp. 2d at 158–59.  The D.C. District Court rejected this argument, and held that EPA is required to make an endangerment finding.  The court ordered EPA to respond to the Plaintiffs' 2007 petition within 90 days. *Center for Biological Diversity v. EPA*, No. 1:10-CV-985 (FJS), 2012 WL 967662 at*1 (D.D.C. Mar. 20, 2012).

37.     On June 14, 2012, EPA responded to the petition and acknowledged its obligation to issue an endangerment finding for greenhouse gas emissions from aircraft engines.  In its response, EPA estimated that such an endangerment finding could be developed, drafted, and published for comment within 22 months.

38.     EPA did not take the preliminary step of issuing a draft endangerment finding for aircraft emission until June 2015, almost three years later.

39.     On June 10, 2015, EPA issued its Proposed Finding that Greenhouse Gas

Emissions from Aircraft Cause or Contribute to Air Pollution that May Reasonably Be

Anticipated to Endanger Public Health and Welfare and Advance Notice of Proposed

Rulemaking.  80 Fed. Reg. 37,758 (July 1, 2015) (Proposed Endangerment Finding and ANPR).

40.     The Proposed Endangerment Finding does not make a final determination

whether greenhouse gas emissions from aircraft endanger public health or welfare.  Nor does it

offer a timetable or proposal for regulating such emissions. EPA estimates 2017 as the earliest

date for publication of a proposed rule, and 2018 as the earliest possible date for the

promulgation of a final rule regulating aircraft emissions.  EPA has yet to issue a finalized

endangerment finding, or to promulgate aircraft emission standards.  On August 5, 2014, as

required by section 304(a) the Clean Air Act, 42 U.S.C. § 7604(a), (b)(1), Plaintiffs filed a 180-

day notice of their intent to file suit for unreasonable delay in finalizing an endangerment finding

and promulgating regulations applicable to greenhouse gas emissions from aircraft.  This notice

period expired on January 31, 2015.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of Clean Air Act Section 231(a) – Endangerment Finding

41.     Plaintiffs re-allege, as if fully set forth herein, each allegation contained in this

complaint.

42.     As alleged above, section 231(a)(2)(A) of the Clean Air Act requires that the

Administrator "shall … issue proposed emission standards applicable to the emission of any air

pollutant from any class or classes of aircraft engines which in his judgment causes, or

contributes to, air pollution which may reasonably be anticipated to endanger public health or

welfare."  42 U.S.C. § 7571(a)(2)(A).

43.     EPA's failure to finally determine whether emissions of greenhouse gases from aircraft engines cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare pursuant to section 231(a) of the Act, 42 U.S.C. § 7571(a), constitutes  unreasonable delay under 42 U.S.C. § 7604(a).

## SECOND CLAIM FOR RELIEF

### Violation of Clean Air Act Section 231(b) – Emission Standards

44.     Plaintiffs re-allege, as if fully set forth herein, each allegation contained in this complaint.

45.     As alleged above, section 231(a)(2)(A) of the Clean Air Act requires that the Administrator "shall … issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A).

46.      EPA's failure to propose and finalize emission standards pursuant to section 231(a) of the Act, 42 U.S.C. § 7571(a) constitutes unreasonable delay under 42 U.S.C. § 7604(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.     Declare that EPA's delay in issuing a final determination regarding whether emissions of greenhouse gases from aircraft engines cause or significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare pursuant to section 231(a) of the Clean Air Act, 42 U.S.C. § 7571(a), is unreasonable; and direct EPA to issue such a determination within 30 days after entry of this Court's judgment.

B.     Declare that if EPA, upon making a determination as directed under paragraph B above, finds that emissions of greenhouse gases from new aircraft engines cause or contribute to

air pollution which may be reasonably anticipated to endanger public health and welfare, then

EPA must initiate rulemaking pursuant to section 231(a) to establish standards to limit such

emissions and direct EPA to propose such standards within 30 days after entry of this Court's

judgment.

      C.     Award Plaintiffs their costs of litigation, including reasonable attorney and expert

witness fees, pursuant to 42 U.S.C. § 7604(d).

      D.     Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

                         Respectfully submitted,

DATED: April 12, 2016          _____

J. MARTIN WAGNER, DC Bar 435730
SARAH H. BURT, *Pro Hac Vice Applicant*
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040
sburt@earthjustice.org

*Attorneys for Plaintiffs Center for Biological
Diversity and Friends of the Earth*

DATED: April 12, 2016          _____

VERA PARDEE, *Pro Hac Vice Applicant*
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Tel: (415) 632 5317
Fax: (510) 844-7117
vpardee@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*